Margaret LARRY and Cleta Page on behalf of themselves and all those similarly situated, Plaintiffs,

v.

Dr. Terry YAMAUCHI, Director of the Arkansas Department of Human Services, Defendant,

Clayton Yeutter, individually and in his official capacity as Secretary of the United States Department of Agriculture, Defendant/Intervenor.

No. LR–C–89–831.

United States District Court, E.D. Arkansas, W.D.

Dec. 21, 1990.

Marilyn F. Rauch, Central Arkansas Legal Services, David J. Manley, Legal Services of Arkansas, Little Rock, Ark., and Brian Wolfman, Public Citizen Litigation Group, Washington, D.C., for plaintiff.

Carolyn Parham Young, Dept. of Human Services, Office of General Counsel, James B. Barnhill, Dept. of Human Services Office of General Counsel, Little Rock, Ark., for defendant.

Brent Bumpers, U.S. Attys. Office, Little Rock, Ark., Marcia K. Sowles and Stephen Hart, Dept. of Justice, Washington, D.C., for defendant/intervenor.

## MEMORANDUM OPINION

SUSAN WEBBER WRIGHT, District Judge.

Certain food stamp recipients challenge the Secretary of Agriculture's policy of counting monetary assistance in the form of utility reimbursements received under the Housing Act, 42 U.S.C. § 1437 *et seq.*, as income for the purposes of calculating food stamp benefits. This case is properly decided on cross-motions for summary judgment.[1] As required by Rule 56 of the Federal Rules of Civil Procedure, there is no genuine issue as to any material fact.

The plaintiffs represent a class consisting of food stamp recipients subject to hav-

---

1. The Court commends counsel for all parties for the excellent briefs in this case.

ing their food stamp allotments reduced or denied on account of the defendants' policy of counting as income monies paid as utility reimbursements by public housing or other authorized agencies. Defendant Yamauchi is the Director of the Arkansas Department of Human Services ("DHS"), the state agency responsible for administering the food stamp program in compliance with federal laws and regulations. Defendant and Intervenor Yeutter, as Secretary of Agriculture, is responsible for establishing national standards for the administration of the food stamp program, including the policy that Section 8 utility reimbursements should be counted as income under the Food Stamp Act, 7 U.S.C. §§ 2011 *et seq.* ("the Act").

Plaintiffs, as recipients of federal housing subsidies, pay "rent" in the amount of thirty percent of their adjusted gross income. Included in the housing subsidy is a predetermined amount for reasonable utilities consumption known as a "utility allowance." Unlike some public housing tenants, the plaintiffs pay some or all of their costs for utilities directly to the utility suppliers. As more fully described below, the utility allowance is credited against the plaintiffs' rental obligation. In cases such as the plaintiffs', where the utility allowance exceeds the amount of their rent payment, the balance of the utility allowance is paid directly to the tenant. This monetary payment is known as a "utility reimbursement."

Households whose utilities are directly provided by the public housing authority do not receive a utility reimbursement. Neither do households for which the utility allowance is less than the rental payment. For these households, the Secretary excludes the utility allowance benefit from household income in calculating food stamp allotments. However, for the plaintiffs and the class they represent, the Secretary counts as household income the utility allowance benefit to the extent it exceeds the plaintiffs' rental obligation and is remitted to the plaintiffs in the form of a utility reimbursement.

The calculation of food stamp benefits is based on the plaintiffs' relative levels of household income; the lower the income level, the more food stamps the household is entitled to receive and vice versa. The plaintiffs' food stamp allotment would be greater each month if, all other things being equal, their utility reimbursements were not included as income by the defendants in calculating their food stamp awards.

The plaintiffs first allege that the counting of utility reimbursements as income for food stamp purposes violates their rights under the Food Stamp Act by failing to properly exclude such payments under 7 U.S.C. § 2014(d)(11)(A), which provides for the exclusion of "any payments or allowances made for the purpose of providing energy assistance ... under any Federal law."

The plaintiffs further claim that the defendants have violated their rights under the equal protection clause of the fourteenth amendment and the due process clause of the fifth amendment by creating an arbitrary and irrational distinction (1) between households whose utility allowance does not exceed the total rent obligation (in which case no part of the utility allowance is counted as food stamp income) and households whose utility allowance does exceed the total rent obligation (in which case the utility reimbursement is counted as food stamp income), and (2) between households that do not receive utility reimbursements because the public housing agency directly provides the energy, leaving the tenant family with no obligation to the utility company (in which case no part of the utility allowance is counted as food stamp income), and households that receive utility reimbursements (in which case the reimbursement is counted as food stamp income).

Finally, the plaintiffs allege that Defendant Yeutter failed to follow the rule-making procedures set forth in the Administrative Procedure Act, 5 U.S.C. § 553, prior to directing Defendant Yamauchi to count the plaintiffs' utility reimbursement as food stamp income, that such failure was arbi-

trary, capricious, and an abuse of discretion under 5 U.S.C. § 706(2)(A), and that the directives given to Defendant Yamauchi are thus null and void.

The plaintiffs seek declaratory and injunctive prospective relief as well as retrospective relief in the amount of reimbursements for all past food stamp benefits withheld as a result of the challenged policy. For the reasons that follow, the Court grants the defendants' motion for summary judgment and denies the plaintiffs' motion for summary judgment.

## I. STATUTORY AND REGULATORY BACKGROUND

### A. The United States Housing Act

Under the United States Housing Act of 1937, 42 U.S.C. § 1437 *et seq.*, as amended, the Department of Housing and Urban Development ("HUD") operates and funds various housing programs for low income families to remedy "the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income." 42 U.S.C. § 1437. These programs include low-rent public housing owned and operated by public housing agencies ("PHAs"), *see* 42 U.S.C. § 1437c, and the Section 8 Housing Assistance Payment Program, authorized by the Housing and Community Development Act of 1974, Pub.L. 93–383, 88 Stat. 633, 656 (codified at 42 U.S.C. § 1437f), which provides assistance payments for low-income families renting units from private landlords and other entities. HUD pays Section 8 subsidies through the

local PHA to the owners, landlords, or mortgagees rather than directly to the beneficiaries. *See* 42 U.S.C. § 1437f(b) and (c).[2] The amount of HUD's contribution under the Section 8 program is equal to the difference between the contract rent and the amount the household is required to pay. 42 U.S.C. § 1437f(c)(3).

Under both programs, the Brooke Amendment to the Housing Act generally limits the rent that may be charged for a dwelling unit assisted under the Housing Act to thirty percent of a household's monthly adjusted income. 42 U.S.C. § 1437a(a)(1). The tenant's rental obligation for occupancy of a public housing or Section 8 unit is called the "Total Tenant Payment." 24 C.F.R. §§ 813.107 (Section 8 and related programs), 913.107 (public housing and related programs). Rent covers all housing costs, including occupancy and utilities. 24 C.F.R. §§ 882.105(a) (Section 8), 965.472 (public housing). *See* 42 U.S.C. § 1437f(c)(1) (rent under Section 8 includes "utilities and all maintenance and management charges"). HUD defines "utilities" as "electricity, gas, heating fuel, water and sewerage services, and trash and garbage collection," but not telephone service. 24 C.F.R. § 965.472.

Prior to 1981, the utilities in multi-resident apartment buildings used for public housing were metered on an aggregate basis, with one meter measuring the utility use of the entire building. The PHA included utility costs in the rent charged each tenant, which under the Brooke Amendment could not exceed thirty percent of the

---

**2.** HUD is authorized to contribute funds to local PHAs, which then enter into contracts to make assistance payments to owners of existing dwelling units. 42 U.S.C. § 1437f(b). In the absence of a PHA, the Secretary of HUD is authorized to enter into such contracts directly with the owners. *Id.* Any private person or entity, including a PHA, can be an "owner" if that person or entity has the legal right to lease or sublease new or substantially rehabilitated dwelling units as described in Section 8. *Id.* § 1437f(f)(1).

The assistance contracts "establish the maximum monthly rent (including utilities and all maintenance and management charges) which the owner is entitled to receive for each dwelling unit with respect to which such assistance payments are to be made." 42 U.S.C.

§ 1437f(c)(1). The maximum monthly rent under these contracts is set by the Secretary of HUD periodically with reference to "the fair market rental ... for existing or newly constructed rental dwelling units of various sizes and types in the market area suitable for occupancy by [Section 8 tenants]," *id.,* and is adjusted in accordance with "changes in the fair market rentals," *id.* § 1437f(c)(2)(A), or "to reflect increases in the actual and necessary expenses of owning and maintaining the units which have resulted from substantial general increases in real property taxes, utility rates, or similar costs which are not adequately compensated for by the adjustment [for changes in the fair market rentals]," *id.* § 1437f(c)(2)(B).

tenant's adjusted gross income. In 1981 HUD began requiring local PHAs to install individual utility meters for each unit of public housing to encourage reduced energy consumption. 24 C.F.R. §§ 965.401–410.

Presently, there are three methods for paying utilities in public and Section 8 housing. First, in some public housing units, the PHA may still purchase the utilities directly and add the monthly utility costs to the rental payment. However, the tenant pays no more than thirty percent of his adjusted gross income under the Brooke Amendment, subject to additional flat fee charges for certain appliances. 24 C.F.R. §§ 965.471(b), 965.477(b). Second, in public housing units where "checkmeters" have been installed to measure the consumption of PHA-supplied utilities, the PHA may assess a surcharge if the tenant exceeds a predetermined average utility consumption figure. The surcharge is a payment owed in addition to the Brooke Amendment rent charge. 24 C.F.R. § 965.470–72. Third, an individual meter is installed at the dwelling unit and the resident purchases utility services directly from the utility supplier.

Where the PHA or Section 8 owner does not supply utilities to the tenant and the tenant must pay utility costs directly, HUD "historically has considered that 'rent' should take into account some amount paid by the tenant family for utilities and accordingly has permitted a deduction to be made from the rent paid to the owner [by the tenant] on account of the separate payment being made to the utility supplier." 47 Fed.Reg. 57060 (December 29, 1982). This deduction for the estimated value of utilities paid directly by the household is called a "utility allowance," 24 C.F.R. §§ 813.102, 913.102, which the tenant receives monthly from the PHA. Utility allowances ("UAs") are not based on an individual family's actual expenses, but rather reflect an estimate made or approved by a PHA or HUD of "the monthly costs of a reasonable consumption of such utilities and other services for the unit by an energy-conservative household of modest circumstances consistent with the requirements of a safe, sanitary, and healthful living environment." 24 C.F.R. §§ 813.102. *See* 913.102, 965.476(a).[3]

Where the amount of the UA is *less* than the household's Total Tenant Payment ("TTP"), the UA is credited against the TTP and the tenant pays the difference to the PHA or private landlord, depending on the type of assisted housing involved.[4] Thus, in these cases, the UA involves no direct remittance to the household, but merely constitutes a credit that reduces the household's payment to the landlord.

Where the amount of the UA is *greater* than the TTP, the tenant receives from the PHA a check for the excess known as a "utility reimbursement" ("UR"). 24 C.F.R. §§ 813.102, 913.02.[5] URs are paid directly to the tenant, unless the tenant and the utility company consent to have the reimbursement paid jointly to the tenant and the utility company, or directly to the utili-

---

**3.** The Third Circuit observed in *West v. Bowen,* 879 F.2d 1122, 1129 n. 8 (3rd Cir.1989), that the policy behind flat-rate allowances apparently was designed "to encourage residents to conserve energy so that if a resident spends less than the flat rate reimbursement, the difference may be pocketed." However, as the court noted, a tenant in a building with poor insulation or a costly, inefficient heating system may end up losing money under this system. *Id.*

**4.** 24 C.F.R. § 813.102 defines "tenant rent" under the Section 8 housing assistance program as:

The amount payable monthly by the Family as rent to the Owner (including a PHA). Where all utilities (except telephone) and other essential housing services are supplied by the Owner, Tenant Rent equals the Total Tenant Payment. Where some or all utilities (except telephone) and other essential housing services are not supplied by the Owner and the cost thereof is not included in the amount paid as rent to the Owner, Tenant Rent equals Total Tenant Payment less the Utility Allowance.

A similar definition of "tenant rent" for public housing provided by a PHA is found in 24 C.F.R. § 913.102.

**5.** Such payments are sometimes called "negative rents," 47 Fed.Reg. 57960, and the public housing tenants who receive the payments are known as "negative rent tenants," Affidavit of Robert Coxon at ¶ 15.

ty company. 24 C.F.R. §§ 813.108, 913.-108. Thus, these households receive part of their UA in the form of a direct money subsidy. While there is no requirement that the tenant spend the money he receives as a UR on anything in particular, *Mitchell v. Block*, No. 82–3297–3, slip op. at 6–7 (D.S.C. June 22, 1983), many tenants apparently apply all or part of the amount to their actual utility costs.

## B. The Food Stamp Program

In 1964 Congress established the federal food stamp program, administered at the federal level through the United States Department of Agriculture ("USDA"), in order to "raise levels of nutrition among low-income households." Food Stamp Act of 1964, Pub.L.No. 88–525 § 1, 78 Stat. 703 (1964) (now the Food Stamp Act of 1977, codified as amended at 7 U.S.C. § 2011, *et seq.*). Under the Act, eligible households in participating states receive coupons, commonly referred to as "food stamps," that can be used to purchase food at retail stores. 7 U.S.C. § 2013(a).

A household's eligibility to participate in the food stamp program is determined by calculating the income resources available to the household. 7 U.S.C. § 2014. A household pays for the stamps at a reduced rate of the coupon's face value, this fractional rate being dependent upon the household size and adjusted monthly income. As income increases, the corresponding cost of the food stamps also increases.

The Act reposes broad discretion in the Secretary of Agriculture ("the Secretary") to issue regulations necessary for efficient administration of the food stamp program, and to define income and resource eligibility standards. *See id.* §§ 2013(c), 2014(b). *See also Knebel v. Hein*, 429 U.S. 288, 292–93, 97 S.Ct. 549, 552–53, 50 L.Ed.2d 485 (1977). The program is administered by state agencies which make the actual determinations of eligibility, calculate the appropriate amount of stamps to be issued

to each eligible household, and issue the stamps. 7 U.S.C. § 2020. In carrying out their duties under the Food Stamp Act, the state agencies must adhere to regulations implementing the Act promulgated by the Secretary. 7 U.S.C. § 2013(c).

In 1977 Congress codified the allowable exclusions and deductions when computing household income for purposes of determining food stamp eligibility and benefit levels. Food Stamp Act of 1977, Pub.L. No. 95–113 § 1301, 91 Stat. 958, 962–63, (codified as amended at 7 U.S.C. § 2014(d) and (e)). The current version of the Act broadly defines a household's income to include "all income from whatever source" with thirteen specific exemptions, 7 U.S.C. § 2014(d)(1)–(13), and four deductions, 7 U.S.C. § 2014(e), including, when applicable, an "excess shelter deduction." [6]

In the Food Stamp Act amendments of 1980, Congress enacted section 2014(d)(11), which excluded from the definition of "income" for food stamp benefit purposes "any payments or allowances made under any Federal, State or local law for the purpose of providing energy assistance." Pub.L. 96–249, §§ 102, 112, 94 Stat. 357, 361 (1980). By way of the Hunger Prevention Act of 1988, Pub.L. 100–435, 102 Stat. 1645, Congress amended 7 U.S.C. § 2014(d)(11) so that it now exempts as income "any payments or allowances made for the purpose of providing energy assistance ... under any Federal law."

DHS issues a Food Stamp Certification Manual which is a codification of state regulations used to administer the food stamp program in Arkansas. Section 5722 of that manual specifies that "[u]tility assistance payments from HUD or the Housing Authority will be considered unearned income." This state regulation is based upon DHS' interpretation of the USDA regulation explaining income exclusions, 7 C.F.R. § 273.9(c)(11), which merely repeats the wording of 7 U.S.C. § 2014(d)(11)(A).[7]

---

6. 7 U.S.C. § 2014(e) permits an excess shelter deduction for housing costs that exceed 50% of the monthly household income after all other applicable deductions have been allowed.

7. Section 8 and public housing direct payments historically have been included as income for food stamp purposes. For example, 7 C.F.R. § 273.9(c)(1)(iii), promulgated to implement the 1977 Act, provides in part that:

No part of the HUD utility allowance received by a food stamp recipient which is used simply to offset the amount of rent due (the TTP) is counted as income by the DHS in calculating the food stamp allotment. However, all of the utility allowance received by a food stamp recipient which is more than the amount needed to offset the TTP, and thus is remitted to the recipient in the form of a utility reimbursement, is counted as income by the DHS in determining food stamp benefits. The food stamp recipient's allotment would be greater each month if, all other things being equal, his utility reimbursement was not included as income in calculating his food stamp allotment.

## II. FACTS CONCERNING PLAINTIFFS

### A. Plaintiff Margaret Larry

Plaintiff Margaret Larry receives a subsidy from the Section 8 Rental Assistance Program ("the Program"), a PHA in DeWitt, Arkansas, to pay her rent to a private landlord. Under the Brooke Amendment, her Total Tenant Payment is $52 per month. The remaining amount of the market rent is paid to the landlord by the Program using the HUD-funded subsidy.

Since Ms. Larry is directly responsible for both her electric and water bills, she receives a monthly utility allowance ("UA") of $96. The Program has determined that this amount reflects a reasonable average of the cost in the community of those utilities used in the rental home. Because her UA exceeds her TTP, Ms. Larry pays no cash rent to her landlord and also receives from the Program a utility reimbursement ("UR") of $44 per month.[8]

Ms. Larry participates in the food stamp program. In calculating her food stamp benefits, the DHS treats the UR as income. She receives $219 per month in food stamp benefits. If the UR was not counted as income, Ms. Larry would receive approximately $20 more per month in food stamp benefits.[9]

### B. Plaintiff Cleta Page

Plaintiff Cleta Page rents an all electric three-bedroom apartment in a federally subsidized housing complex operated by Sunbelt Properties Corporation ("Sunbelt") in Stuttgart, Arkansas. Ms. Page's TTP under the Brooke Amendment is $37 per month.

Sunbelt has established UAs for the apartments at the housing complex. These UAs have been approved by HUD and are

---

Payments in money that are not made to a third party, but are made directly to the household, are counted as income and are not excluded as a vendor payment, except that rent or housing subsidies paid to a landlord by HUD or its agents under the experimental housing allowance program in Green Bay, Wis., or South Bend, Ind., shall be considered a vendor payment regardless of whether the payment is made directly to the landlord or paid to the landlord through the household. *Id.* (originally published at 43 Fed.Reg. 47846, 47904 (Oct. 17, 1978)). *See Ruhe v. Bergland,* 683 F.2d 102 (4th Cir.1982); *Mitchell v. Block,* No. 82-3297-3 (D.S.C. June 22, 1983); *but see Baum v. Yeutter,* 750 F.Supp. 845 (N.D.Ohio 1990).

8. Ms. Larry states that she uses the UR to pay all or part of her electric bill each month, making up any deficiency out of the money she receives under the Aid to Families with Dependent Children ("AFDC") program. Affidavit of Margaret Larry at ¶ 7. She indicates that the UR is usually enough to pay the whole bill, except when the charges are higher during the hottest and coldest months. *Id.* at ¶ 8. The following figures

represent her electricity costs for the specified months:

|  |  |  |
|---|---|---|
| January 1989 | = | $ 93.85 |
| April 1989 | = | $ 69.90 |
| September 1989 | = | $103.98 |
| December 1989 | = | $ 95.10 |
| January 1990 | = | $152.67 |

*Id.* at ¶¶ 8, 9, 10.

9. In response to interrogatories submitted by plaintiffs' counsel, Defendant Yamauchi indicated that for the time period of October 1988 through January 1990, Ms. Larry received $181 less in food stamps than she would have received if her URs had not been counted as income. This is an average of approximately $11 per month in food stamps. However, these figures also indicate that the average difference in the food stamp allotment from August 1989 through January 1990, the six months preceding the defendant's response, was approximately $20 per month. *See* Plaintiffs' Reply to Defendant's Response to Motion for Preliminary Injunction, Exhibit A (chart comparing differences in food stamp allotments with and without counting the URs as income).

for electricity use only. The UA for Ms. Page's family, and for all three-bedroom apartments at the complex, is $86 per month. Because Ms. Page's TTP is less than her UA, she is not required to make any rental payment to Sunbelt. She receives a check each month from Sunbelt in the amount of $49 as a UR. This amount is the difference between the UA and Ms. Page's obligation for rent and utilities under the Brooke Amendment. Ms. Page must pay her electric bill each month to the local electric utility company. This is the only utility that she is required to pay.

Ms. Page participates in the food stamp program. Her $49 per month UR is counted as income by the defendants in calculating her food stamp benefits. Her food stamp allotment would be greater each month if, all other things being equal, her UR was not included as income for food stamp purposes.

## C. The Plaintiffs as Class Representatives

The Court, by Order dated February 13, 1990, granted the plaintiffs' motion for class certification.[10] The class certified consists of:

All food stamp recipients and applicants who, since October 5, 1988, have been or who are currently subject to having their food stamps reduced or having their food stamp application denied by reason of defendant's Food Stamp policy which counts utility reimbursements paid by public housing agencies or other authorized agencies and entities, when calculating Food Stamp allotments.

## III. DISCUSSION

In this action, the plaintiffs contend that the defendants have violated the Food Stamp Act, 7 U.S.C. § 2011, et seq., by counting the utility reimbursements they receive under Section 8 of the Housing Act as income for the purpose of calculating food stamp allotments. Specifically, the plaintiffs argue that the money they receive as URs under Section 8 should be excluded under 7 U.S.C. § 2014(d)(11)(A).[11] The validity of this claim turns upon the

**10.** This Order was entered by the Honorable George Howard, Jr., United States District Judge for the Eastern and Western Districts of Arkansas. This action was transferred to the docket of the undersigned on April 30, 1990.

**11.** In Baum v. Yeutter, 750 F.Supp. 845 (N.D. Ohio 1990), the court held that utility reimbursements should not be counted as income under 7 U.S.C. § 2014(d)(1), which excludes from the definition of income for food stamp purposes "any gain or benefit which is not in the form of money payable to a household," an argument not raised by the plaintiffs in the present action.

Relying on statements concerning the § 2014(d)(1) in-kind gains or benefits and vendor payments exclusion contained in the House Report to the Food Stamp Act of 1977, H.R.Rep. No. 95–464, 95th Cong., 1st Sess. 32, reprinted in 1977 U.S.Code Cong. & Admin.News 1971, 1998–2011, the court in Baum decided that since Congress intended to exclude from income HUD housing subsidies, including utility allowances paid or payable to third parties, the Secretary was elevating form over substance by counting as income the remainder of the utility allowance remitted to the tenant in the form of a utility reimbursement which the tenant used to pay his actual utility expenses.

The court reasoned that the UR was not "money payable directly to a household" because the recipients "are paid back, not paid directly, the difference between their rent obligation and the UA, a sum which arises after the PHA determines that [the tenants'] rent is lower than the amount allotted for the UA and [the tenants] actually incur and pay for the amounts represented by the reimbursement check." Baum, 750 F.Supp. at 853. In other words, the recipients are being reimbursed for expenditures, rather than receiving a direct payment of benefits. Thus, according to Baum, § 2014(d)(1) only excludes the UR payment to the extent that it reimburses the recipient for actual utility expenses; the court did not address the factual situation where the UR exceeds the actual amount a public housing resident spends on utilities in a given month. Baum, 750 F.Supp. at 848.

The plaintiffs in Baum also argued that URs should be excluded under 7 U.S.C. § 2014(d)(5) and (6), the fifth and fourteenth amendments to the Constitution, and as a violation of the Administrative Procedure Act. The court did not reach these remaining claims.

Only three other decisions have addresssed the question of whether HUD utility reimbursements constitute income in calculating food stamp allotments. In Mitchell v. Block, No. 82–3297–3 (D.S.C. June 22, 1983), the district court held that Section 8 UR payments are income and are not excluded by 7 U.S.C. § 2014(d)(11). In West v. Bowen, Civ.A. No. 84–3883 (E.D.Pa.

proper interpretation of 7 U.S.C. § 2014(d)(11)(A), which excludes from income "any payment or allowances made for the purpose of providing energy assistance ... under any Federal law." The Secretary of Agriculture has interpreted this exclusion to apply only to those payments made under federal laws designed to assist low income families with *increased* energy costs, such as the Low Income Home Energy Assistance Act ("LIHEAA"), Pub.L. No. 97–35, §§ 2601–10, 95 Stat. 893 (1981) (codified as amended at 42 U.S.C. §§ 8621 *et seq.*). The plaintiffs, on the other hand, interpret this statutory exclusion to encompass *any* general payment or allowance made under federal law that assists low income tenants in paying their energy costs, including Section 8 and public housing URs.

The plaintiffs also claim that the counting of URs as income when calculating food stamp allotments creates an arbitrary and irrational distinction in violation of the equal protection clause of the fourteenth amendment and the due process clause of the fifth amendment. The Court will first consider whether the Secretary of Agriculture has properly determined that UR payments do not fall within the 7 U.S.C. § 2014(d)(11)(A) exclusion, since "[a] court presented with both statutory and constitutional grounds to support the relief requested usually should pass on the statutory claim before considering the constitutional questions." *Califano v. Yamasaki,* 442 U.S. 682, 692, 99 S.Ct. 2545, 2553, 61 L.Ed.2d 176 (1979) (citations omitted).

*A. The 7 U.S.C. § 2014(d)(11)(A) Exclusion*

■ The issue presented here requires that the Court review the Secretary's interpretation of section 2014(d)(11)(A) in accordance with the following instruction:

> When a court reviews an agency's construction of the statute which it adminis-

ters, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction of the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (footnotes omitted). *Accord Murray v. Lyng,* 854 F.2d 303, 305 (8th Cir.1988).

Thus, a two-fold inquiry is necessary. First, the Court must determine whether Congress has unambiguously expressed its intent on the precise question of whether URs should be excluded from income under 7 U.S.C. § 2014(d)(11)(A). This will require an analysis of the express language of the statute. If the language of the statute is ambiguous, the legislative history may then be considered. Second, if congressional intent is unclear upon examination of the language and history of the statute, the Court must decide whether the Secretary's interpretation is reasonable and therefore to be accorded deference.

1. The Statutory Language

The language of the statute itself is the starting point for all statutory interpretation. *United States v. James,* 478 U.S. 597, 604, 106 S.Ct. 3116, 3120, 92 L.Ed.2d 483 (1986). If the statute is plain and

Dec. 17, 1987) (Westlaw, 1987 WL 28346), the court concluded that URs are not excluded under § 2014(d)(5), (6), or (11), and that the counting of URs as income for food stamp purposes does not violate the Brooke Amendment, or the equal protection or due process clauses.

However, the Third Circuit overturned this decision in *West v. Bowen,* 879 F.2d 1122 (3rd Cir. 1989), holding that 7 U.S.C. § 2014(d)(11) requires that URs be exempted from income when determining food stamp benefits. These cases are discussed *infra.*

unambiguous, the court's duty is to give effect to the terms and go no further. *United States v. Rutherford,* 442 U.S. 544, 551, 99 S.Ct. 2470, 2474, 61 L.Ed.2d 68 (1979). Section 2014(d)(11)(A) excludes from income "any payments or allowances made for the purpose of providing *energy assistance* ... under any Federal law" (emphasis added).

The statute clearly limits the exclusion to payments or allowances for energy costs as opposed to *non* energy costs. However, the Housing Act utility allowance is not just for energy use. Rather, it includes electricity, gas, heating fuel, water and sewerage services, and trash and garbage collection—in short, any utility other than telephone that is paid directly by the tenant. 24 § 965.472.[12] While the utility allowance may be used for energy-related expenses, it may help defray nonenergy-related costs as well. Moreover, the utility reimbursement received by the household in the form of negative rent is not segregated into energy and nonenergy utilities. As the district court in *Mitchell* concluded, "there is no way in which it can be said that a specific portion of the money the household receives in cash is really the portion of the utility allowance which was calculated on the basis of energy costs or any other utility costs in particular." Slip op. at 12.[13]

The plaintiffs argue that the majority of class members' URs, like those of Ms. Page, are based on allowances for energy costs only,[14] and that the UAs for the remaining members of the class are heavily weighted toward energy utilities. However, this does not change the fact that URs in both public and Section 8 housing *can* and often *do* include payment for nonenergy utilities. Section 2014(d)(11)(A) clearly excludes *only* payments or allowances made for energy costs.[15] Since UAs and URs *by definition* include both energy and nonenergy utilities, they do not fall within the ambit of the section 2014(d)(11)(A) exclusion. To include them would require equating the word "utility" under the Housing Act with the word "energy" in § 2014(d)(11), something the language of both provisions simply does not permit.

Nor does the fact that class members such as Ms. Larry may spend all of the UR on energy utilities bring the payment within the section 2014(d)(11)(A) exclusion. Ms. Larry cannot transform a utility reimburse-

**12.** For example, Ms. Larry receives a utility allowance because she pays directly for her electricity and water.

**13.** The plaintiffs dispute this claim but offer no authority or evidence to the contrary.

**14.** The plaintiffs claim that this is the case for all class members residing in low-rent public housing owned and operated by a PHA, citing the Affidavit of Robert Coxon, Administrative Officer of the Little Rock Housing Authority (LRHA), and 24 C.F.R. § 965.401 *et seq.* in support. However, Mr. Coxon's affidavit only addresses public housing operated by the LRHA, where this situation exists. He does not indicate that URs are based on allowances for energy costs only in *all* public housing units operated by PHAs. Furthermore, HUD regulations provide for the payment of electricity, gas, heating fuel, water and sewerage services, and trash and garbage collection costs in calculating utility allowances for public housing tenants. *See* 24 C.F.R. §§ 965.470–472.

**15.** The plaintiffs argue that § 2014(d)(11)(A) does not say that the payments or allowances must be *exclusively* for energy assistance, rely-

ing on the following language from the Senate Agriculture Committee Report, S.Rep. 100–397, 100th Cong., 2d Sess. 70, *reprinted in* 1988 U.S. Code Cong. & Admin.News 2239, 2308, describing the purpose of the 1988 amendment to § 2014(d)(11)(A):

> This section would change the order of the Food Stamp Act's language covering energy assistance disregards to make clear that the determination of whether a payment or allowance is to be disregarded depends on the purpose of the payment, rather than whether the statute under which the payment is made, as a whole, is primarily for energy assistance.

The plaintiffs assert that this language indicates the sponsoring committee's belief that the statute requires only that the payment be "primarily" for energy assistance. However, they clearly misread the committee's intent. The word "primarily" is used here in reference to the purpose of the statute, not the purpose of the payment. Thus, while the Senate Report indicates that the exclusion does not require that the primary purpose of the underlying act be for energy assistance, it does not indicate, as the plaintiffs suggest, that the payment itself can have a broader purpose or can include an allowance for nonenergy utilities.

ment payment into an energy assistance payment simply by using the assistance to pay her energy bills. The exclusion focuses on the statutory purpose of the payment, not what the recipient does with the payment. Indeed, if Ms. Larry could obtain the exclusion merely by using the reimbursement to pay her energy bills, anyone receiving Social Security, AFDC, or other federal assistance could argue that those payments should also be excluded because he uses the money to pay his energy bills. In short, the plaintiffs' arguments would transform the section 2014(d)(11)(A) exclusion into a general deduction for energy bills.

While the statutory language clearly distinguishes between energy and nonenergy payments, it unfortunately does not define "energy assistance," and that phrase is subject to two conflicting interpretations. The defendants argue that the phrase should be interpreted narrowly so as to include those payments or allowances designed solely to offset dramatic increases in home energy costs. The plaintiffs argue that the phrase should be interpreted broadly so as to include any general allowance for energy use, including HUD utility reimbursements.

Even if URs were limited to energy costs or the energy component could be segregated for the purposes of this exclusion, there would still be the question of whether URs provided under the Housing Act are the type of payments which Congress in-

tended to exclude when it enacted 7 U.S.C. § 2014(d)(11)(A). The answer to this question turns upon the definition of "energy assistance." [16] Since the statute is silent on this point, it is necessary to examine the legislative background of this exclusion.

### 2. The Legislative History

Neither the 1964 Food Stamp Act nor its pre–1977 amendments defined "income" for the purposes of determining food stamp eligibility or benefit levels. See H.R.Rep. No. 464, 95th Cong., 1st Sess. 40, *reprinted in* 1977 U.S.Code Cong. & Admin.News 1978, 2016. Prior to 1977, the procedure for the calculation of income was set forth in administrative regulations. Over time these regulations became increasingly complex as the Secretary established specific categories of income and a long list of itemized deductions. See id. at 5, *reprinted in* 1977 U.S.Code Cong. & Admin.News at 1982. Unfortunately, the complexity of these regulations led to numerous certification errors, *id.*, and the lack of congressional direction led to several lawsuits over the proper definition of income, id. at 27–29, 31–32, 35, *reprinted in* 1977 U.S.Code Cong. & Admin.News, *supra*, at 2003–05, 2008, 2012.

Responding, in part, to complaints that the system of determining income had become too complex, time-consuming, error-prone, and inequitable, *see id.* at 55–58, *reprinted in* 1977 U.S.Code Cong. & Admin.News, *supra*, at 2033–36, Congress

---

**16.** The plaintiffs' argument can be put in the form of a simple categorical syllogism:

> Major premise: All payments made for energy assistance are excluded from income under § 2014(d)(11).
>
> Minor premise: Utility reimbursements are payments made for energy assistance.
>
> Conclusion: Therefore, utility reimbursements are excluded from income under § 2014(d)(11).

The validity of the plaintiffs' argument depends upon the correctness of the minor premise—whether URs fall within the definition of payments made for "energy assistance." This is why the plaintiffs' reliance on the "all-encompassing language" of the statute as undercutting the defendants' narrow construction, *see* Plaintiffs' Memorandum of Law in Response to Federal Defendant's Motion for Summary Judgment at 5–8, begs the question as to whether the

payment or allowance constitutes "energy assistance" as contemplated by Congress when enacting this exclusion.

The fact that § 2014(d)(11)(A) excludes *"any* payments or allowances made for the purpose of providing energy assistance ... under *any* Federal law," *id.* (emphasis added), and that Congress intended that such assistance "would be entirely excluded from food stamp income *regardless of the form it takes,"* H.R.Rep. No. 788, 96th Cong., 2d Sess. 123, *reprinted in* 1980 U.S.Code Cong. & Admin.News 843, 956 (emphasis added), only means that "energy assistance" payments should be excluded from food stamp income without regard to whether the program is designed solely for the purpose of providing such assistance. Nevertheless, it is still necessary to determine whether the payment constitutes "energy assistance."

amended the Act in 1977, enacting a series of wide-ranging reforms. For benefit level determinations, Congress defined income as "all income from whatever source," excluding only eight "specified items." *Id.* at 24, *reprinted in* 1977 U.S.Code Cong. & Admin.News, *supra*, at 2001. Congress specifically noted its intent to define income as broadly as possible:

> The Committee chose to rely on a combination of this terminology—"all income from whatever source derived." The Committee's intent in employing that term by reference is *to cast the broadest possible net, including all forms of what has been found to constitute income.*

*Id.* (emphasis added). *See also Mitchell v. Block,* No. 82–3297–3, slip op. at 15–16 (D.S.C. June 22, 1983). Congress also eliminated the complex and confusing scheme of administrative deductions, establishing instead four statutory deductions, including one equally applicable to all households and and another for excess shelter expenses.[17]

Before 1979, federal programs did not specifically designate direct payments to low-income households for the purpose of energy assistance. Programs such as AFDC and Section 8 provided benefits which in various ways were intended to defray energy costs along with other expenses. *See Mitchell,* slip op. at 18–19. Since an individual in these programs received an increase in real income, Congress never expressed any inclination to exclude payments received under these programs as income for calculating food stamp bene-

fits. *Id.* at 19. In fact, if Congress desires to exclude payments under any public assistance or benefit program from being counted in determining food stamp income, that intent specifically must be determinable upon review of the law providing for such payments.

> Under the Food Stamp Act of 1977, household income includes "all income from whatever source" with 10 specific and limited exclusions. Under this system, assistance payments from Federal or federally aided public assistance programs or State and local benefit programs are considered to be fully includible income unless the law providing for these payments contains language that "specifically excludes" those payments from consideration as income for determining eligibility for the food stamp program.

H.R.Rep. No. 788, 96th Cong., 2d Sess. 121, *reprinted in* 1980 U.S.Code Cong. & Admin.News 843, 954.

The need for an eleventh exclusion in calculating income for food stamp benefits arose in the fall of 1979

> in connection with the Federal Government's efforts to *offset* low-income household's *increased home energy costs* through a range of intervention including payments, for example, to fuel oil vendors as well as direct cash payments to the households to be used to purchase fuel. Since the idea of these *new programs* was essentially to hold low-income households harmless by per-

---

**17.** The Food Stamp Act deals with a household's energy expenses by means of (1) a standard deduction designed to reflect increases in the Consumer Price Index for items other than food, 7 U.S.C. § 2014(e), (2) an excess shelter deduction for shelter costs that exceed 50% of monthly household income after all other deductions have been made, 7 U.S.C. § 2014(e), and (3) a calculation of benefits that insures that food stamp households will have at least 70% of their income available for nonfood purchases, 7 U.S.C. § 2017(a).

Prior to the 1977 amendments, the Secretary allowed a deduction for "shelter costs" in excess of 30% of net household income. *See* H.R.Rep. No. 464, *supra*, at 49–50, *reprinted in* 1977 U.S. Code Cong. & Admin.News, *supra*, at 2027. Shelter costs included payments for occupancy,

for utilities such as heating, electricity, water and sewer, and garbage collection, when such payments were made separately from occupancy payments, for taxes, and for vendor payments. *Id.* In 1977 Congress combined most of the long list of administrative deductions, including shelter costs, into a standard deduction equally applicable to all eligible households. *See id.* at 55–60, *reprinted in* 1977 U.S.Code Cong. & Admin.News, *supra*, at 2033–38. Congress also enacted an excess shelter deduction which allows households with special shelter needs, such as those in particularly cold climates, to offset some or all of those costs to the extent that they exceed 50% of net household income. *See id.* at 62–67, *reprinted in* 1977 U.S.Code Cong. & Admin.News, *supra*, at 2040–45.

mitting them to buy the same amount of energy they would have utilized in past years without having to diminish their already marginal incomes, the programs represented more of a wash transaction than any real increase in the recipient or benefitted households' purchasing power. *Id.* at 121–22, *reprinted in* 1980 U.S.Code Cong. & Admin.News, *supra,* at 954–55 (emphasis added).

These "new programs" were created to assist low-income persons with the dramatic increases in energy costs beginning in the late 1970s and early 1980s. For example, in 1980 Congress passed the Home Energy Assistance Act ("HEEA") (Title III of the Crude Oil Windfall Profit Tax Act of April 2, 1980, 94 Stat. 229, 288–99, formerly codified at 42 U.S.C. §§ 8601–12 (Supp. IV 1976)), to protect fixed-income, lower-income, and lower-middle-income households "from disproportionately adverse effects on their incomes," 42 U.S.C. § 8601(a)(4), resulting from both recent and projected "dramatic increase[s] in the cost of primary energy sources," *id.* § 8601(a)(1) and (2), by "mak[ing] grants to states to provide assistance to eligible-households *to offset the rising costs of home energy that are ex-*

*cessive in relation to household income,"* *id.* § 8601(b) (emphasis added). The HEAA subsequently was repealed in 1981 and reenacted as the Low Income Home Energy Assistance Act ("LIHEAA"), Pub.L. No. 97–35, §§ 2601–10, 95 Stat. 893 (1981) (codified at 42 U.S.C. §§ 8622–29 (1982)), but the purpose of the program remained unchanged.[18] *See Department of Health & Welfare, State of Idaho v. Block,* 784 F.2d 895, 896–97 (9th Cir.1986).

As suggested in the above language from the committee report, Congress faced the problem of how to account fairly for this new form of energy assistance which equalized increased costs but provided no increase in a recipient's real income. While the new programs contained provisions excluding the energy assistance payments as income,[19] the Senate, during deliberations on the HEEA, adopted an amendment to the Food Stamp Act of 1977 inserting an exclusion covering "any income attributable to an increase in State public assistance grants which is intended primarily to meet the increased cost of home energy." H.R. Rep. No. 788, *supra,* at 122, *reprinted in* 1980 U.S.Code Cong. & Admin.News, *supra,* at 955.[20] However, the House Com-

---

**18.** New programs also were created under the Interior and Related Agencies Appropriations Act of 1979, Pub.L. No. 96–126, 93 Stat. 954, 978, and the Community Services Act of 1974, Pub.L. No. 93–644, 88 Stat. 2291, 2294–95 (formerly codified at 42 U.S.C. § 2809 (repealed 1981)), which authorized programs "designed to lessen the impact of the high cost of energy" on "low-income individuals and families." 42 U.S.C. § 2809(a)(5). *See Theriault v. Brennan,* 488 F.Supp. 286, 298 (D.Me.1980).

Congress enacted these programs because of its concern that "the *ordinary* mechanisms for adjusting income assistance programs to rising costs of living may be inadequate to meet the *extraordinary increases* which have taken place in energy costs." S.Rep. No. 394, 96th Cong., 2d Sess. 111, *reprinted in* 1980 U.S.Code Cong. & Admin.News 410, 520 (emphasis added).

**19.** The Interior and Related Appropriations Act included language which specifically indicated that "energy allowances shall not be considered as income or resources under any other public or publicly assisted income tested program." Pub.L. No. 96–126, 93 Stat. 954, 978. *See* H.R. Rep. No. 249, *supra,* at 122, *reprinted in* 1980 U.S.Code Cong. & Admin.News, *supra,* at 955.

The HEAA contained the following provision formerly codified at 42 U.S.C. § 8612(c):

> Notwithstanding any other provision of law, the amount of any fuel assistance payments or allowances provided to an eligible household under this chapter shall not be considered income or resources of such household (or any member thereof) for any purpose under any Federal or State law, including any law relating to taxation, public assistance or welfare program.

*Id.* *See Department of Health & Welfare, State of Idaho v. Block,* 784 F.2d 895 (9th Cir.1986); *Schmiege v. Secretary of Agriculture of the United States,* 693 F.2d 55 (8th Cir.1982); *Seban v. Block,* 626 F.Supp. 545 (S.D.Ind.1985).

**20.** Senator Pell (D.-R.I.) offered this amendment to insure that increases in state public assistance benefits specifically earmarked for energy costs would not be offset by corresponding cuts in food stamp benefits, because the federal government apparently had been slow to provide energy assistance during the winter of 1980 and some states had increased their public assistance payments to help low-income households meet the dramatic increase in home heating costs. H.R.Rep. No. 249, *supra,* at 122,

mittee on Agriculture "prefer[red] that amendments to the Food Stamp Act be made under its aegis," *id.,* and therefore decided to "incorporate the essence," *id.,* of these existing exclusions into an eleventh exclusion which would encompass "any payments or allowances made under any Federal, State, or local laws for the purpose of providing energy assistance," Food Stamp Amendments of 1980, Pub.L. No. 96–249, § 102, 94 Stat. 357 (1980) (formerly codified at 7 U.S.C. § 2014(d)(11)).

The Committee's clear intent was to exclude only those payments "that focus on the problem of energy assistance," H.R. Rep. No. 788, *supra,* at 123, *reprinted in* 1980 U.S.Code Cong. & Admin.News, *supra,* at 956, in the sense that they offset spiraling increases in the costs of energy, specifically high home heating costs. The Committee recognized that such energy assistance could be funnelled through existing state-administered general assistance programs, however,

> [w]here energy assistance provided households through the use, in part or in total, of Federal, State, or local funds flowing from Federal, State, or local laws *not specifically dealing with energy assistance* is concerned, such as Aid to Families with Dependent Children or General Assistance, the Committee also intends to guarantee excludability provided that the Department is satisfied that the increase in benefits awarded by the State or local government (either on a matching basis with the Federal Government or on its own) is, in fact, *an energy assistance-related increase and not simply a general welfare increase that would have occurred even were*

*reprinted in* 1980 U.S.Code Cong. & Admin. News, *supra,* at 955.

**21.** The Secretary's regulation implementing the 1980 exclusion virtually parroted the aforementioned legislative history. The exclusion applied to:

> Payments or allowances made under any Federal, State or local laws for the purpose of energy assistance. These payments or allowances must be clearly identified as energy assistance by the legislative body authorizing the program or providing the funds. Among the Federal payments that would be excluded

*energy costs not a factor* and that, therefore, should be viewed as income for food stamp purposes. *Only where energy costs are a but—for cause of the increased payment* should the payment be excluded from income and, then, *only to the extent that the increase is attributable to high heating costs* rather than general inflationary conditions.

*Id.* (emphasis added). Thus, only those segregable portions of state-administered general assistance programs which had been especially adapted to offset increased energy costs could be excluded under this provision.

In 1980 the Secretary implemented the new exclusion, but did not apply it to HUD utility reimbursements. *See Mitchell,* slip op. at 21–22.[21] Congress did not review or criticize the Secretary's decision when it amended the exclusion in 1981. *See id.* at 23–25 n. 21. The 1981 amendments were necessary because, contrary to Congress' expectation, *see* H.R.Rep. No. 788, *supra,* at 123, *reprinted in* 1980 U.S.Code Cong. & Admin.News, *supra,* at 956, several states moved to redesignate their benefits as a means of shifting some of their welfare burden to the federal government. *See* S.Rep. No. 128, 97th Cong., 1st Sess. 33 (1981); 127 Cong.Rec. 24854–55 (1981) (statement by Rep. Roukema). Accordingly, in 1981 Congress amended section 2014(d)(11) to close this "loophole" by adding sub-part (B), which contained new requirements for excluding energy assistance benefits provided under state and local laws. Food Stamp Amendments of 1981, Pub.L. No. 97–98, § 1308, 95 Stat. 1283 (codified at 7 U.S.C. § 2014(d)(11)(B)).

> are energy assistance payments provided through the Department of Health and Human Services' Low–Income Energy Assistance Program and the Community Services Administration's Energy Crisis Assistance and Crisis Intervention Programs.

7 C.F.R. § 273.9(c)(10)(v) (first published July 8, 1980). *See Mitchell,* slip op. at 22. On April 19, 1983, the Secretary published the final version of this regulation in 7 C.F.R. § 273.9(c)(11). This regulation, which superseded 7 C.F.R. § 273.9(c)(10)(v), eliminated the reference to the now defunct Community Service Administration's programs and incorporated Congress'

In 1988 Congress amended the exclusion to insert the phrase "for the purpose of providing energy assistance" after the terms "payments or allowances."[22] Hunger Prevention Act of 1988, Pub.L. No. 100–435, 102 Stat. 1645 (1988). The purpose of the change in the order of the language was "to clarify that USDA and local agencies do not need to conduct an inquiry into the purpose of a federal statute before excluding federal 'payments for the purpose of energy assistance.' The law as now written could be read to require this analysis." S.Rep. No. 397, 100th Cong., 2d Sess. 28, *reprinted in* 1988 U.S.Code Cong. & Admin.News 2239, 2266.[23] The Senate Report further explains that "[t]he crucial question should be whether the purpose of the payment is energy assistance, not whether the statute, as a whole, is primarily for energy assistance or includes other human services as well." *Id.* at 29, *reprinted in* 1988 U.S.Code Cong. & Admin. News, *supra*, at 2267. However, this "technical correction" was "not intended to change current policy." *Id.* at 28–29, *reprinted in* 1988 U.S.Code Cong. & Admin. News, *supra*, at 2266–67.

The analysis of the legislative background of section 2014(d)(11)(A) leads to but one conclusion: the definition of "energy assistance" does not encompass Section 8 and public housing utility reimbursements. Several reasons support this conclusion. First, payments for "energy as-

sistance" were made not as a general allowance for routine energy expenses, but rather to offset rapid increases in home energy costs. Consistent with the principle that exclusions be "specific" and "limited," Congress had certain specially designed programs in mind when it enacted the 2014(d)(11) exclusion—programs that produced no increase in the beneficiary's real income. The "new programs" contemplated by Congress included those created by the Interior and Related Appropriations Act of 1979 and the Home Energy Assistance Act of 1980. In contrast, the Section 8 program, for example, was not a "new program" at the time Congress enacted 7 U.S.C. § 2014(d)(11)—it had been in existence for six years. *See* Pub.L. No. 93–383, § 201(a), 88 Stat. 662 (1974).

Second, utility reimbursements under the Housing Act do not "focus" on the problem of energy assistance. Rather, the primary purpose of the Housing Act is to remedy "the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income." 42 U.S.C. § 1437.[24] The Housing Act provides assistance for energy costs incidentally in the form of real income benefits, not a "wash."

Third, there is no indication in the legislative history that Congress ever intended to exclude HUD utility reimbursements under section 2014(d)(11)(A).[25] No mention is

1981 amendments to the exclusion, as discussed *infra.*

**22.** The current version excludes "any payments or allowances made for the purpose of providing energy assistance (A) under any Federal law, or (B) under any State or local laws, designated by the State or local legislative body authorizing such payments or allowances as energy assistance." 7 U.S.C. § 2014(d)(11).

**23.** Indeed, the law *was* read to require that the purpose of the law rather than the purpose of the payment be for energy assistance. For example, the district court in *Mitchell* based its holding in part on the fact that the purpose of Section 8 of the Housing Act was to provide housing assistance, not energy assistance. Slip op. at 11–13. The district court in *West,* in a decision which subsequently was reversed, also concluded that since the purpose of the federal law must be to provide energy assistance, utility rebates paid under the Housing Act did not

qualify under this exemption because the Housing Act itself was not designed to provide energy assistance. *See West v. Bowen,* 879 F.2d 1122, 1130 (3rd Cir.1989) (restating the district court's decision).

**24.** Section 8 was enacted "[f]or the purpose of aiding lower-income families in obtaining a decent place to live and of promoting economically mixed housing." 42 U.S.C. § 1437f(a).

**25.** The plaintiffs concede that "the impetus for the 1980 and 1981 amendments may have been the enactment of federally-funded direct energy assistance programs such as LIHEAP and its predecessors," but argue that it was the intent of Congress, as demonstrated by the statutory language and legislative history, not to restrict the exemption to just these programs. Plaintiffs' Memorandum of Law in Support of Plaintiffs' Response to Federal Defendant's Motion for Summary Judgment at 16–17. *See also West,*

made of Section 8 or public housing laws in reference to the "energy assistance" exclusion, even though they existed prior to the 1980 amendments, nor did Congress even remotely suggest in the subsequent amendments that it was expanding the scope of the original § 2014(d)(11) exclusion to include utility payments under the Housing Act. For example, while the 1988 amendment specified that it was the purpose of the payment rather than the purpose of the program that determined whether the payment was for "energy assistance," the Senate Report unequivocally states that the change in the statutory language was not intended to change current policy.

Finally, Congress has incorporated adjustments for general utility expenses into other provisions in the Food Stamp Act, such as the standard deduction and the excess shelter expense deduction. As the court in *Mitchell* observed, "[t]he fact that Congress dealt with energy expenses in other provisions of the [Food Stamp] statute suggests that Congress did not intend to enact a blanket exclusion for payments received to meet such expenses." Slip op. at 10–11.

The Court finds that the Act and its legislative history unambiguously limit the definition of "energy assistance" to payments or allowances designed to offset high home energy costs, rather than general assistance payments for normal energy expenses. However, even if this Court had found that congressional intent is vague, or that Congress did not address the precise question at issue, the Court still would conclude that the Secretary's position is based on a permissible construction of the statute and therefore should be accorded deference under the *Chevron* standard. *See* 467 U.S. at 842–43, 104 S.Ct. at 2781–82. *See also K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988) (if statute is silent or ambiguous with respect to specific issue addressed by regulation, reviewing court must give deference if it does not conflict with statute's plain meaning); *Springdale Memorial Hosp. Ass'n, Inc. v. Bowen,* 818 F.2d 1377 (8th Cir.1987) (substantial deference accorded to agency's interpretation only if it has a reasonable basis in law and does not frustrate congressional intent).[26]

The plaintiffs rely on *West v. Bowen,* 879 F.2d 1122 (3rd Cir.1989), in support of their position concerning the statutory exclusion. In *West* the plaintiff class of federal housing residents received utility reimbursement checks and sought to enjoin the Secretary of Agriculture from including the amount of the reimbursements as income when calculating food stamp benefits on the basis of the exclusions in 7 U.S.C. § 2014(d)(5), (6), and (11), the Brooke Amendment, the Administrative Procedure Act, and the due process clause. *West v. Bowen,* Civ.A. No. 84–3883 (E.D.Pa. Dec. 17, 1987). The Third Circuit reversed the district court's grant of summary judgment to the Secretary and entered judgment in favor of the plaintiff class, holding that the income was excluded as "energy assistance" payments pursuant to 7 U.S.C. § 2014(d)(11)(A). The district court had examined the language of the exclusion and decided that in order for the UR to be

---

879 F.2d at 1131 (identical concession from the plaintiff). However, the plaintiffs point to nothing in the legislative history which shows that Congress decided to expand the scope of the exclusion beyond these programs, other than the all-inclusive language—an argument which, as explained in footnote 15, misses the point.

**26.** Agency interpretation of a statutory provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view. *I.N.S. v. Cardoza–Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). In a supplemental brief filed on September 19, 1990, the plaintiffs contend that newly-discovered documents show that the policy the Secretary de-

fends in this action, rather than being consistent, has "in fact flip-flopped over the years." However, the Court finds that the exhibits attached in support of the plaintiffs' brief, when read together with additional documents submitted by the Secretary, show that the Secretary's interpretation of § 2014(d)(11)(A) has remained consistent despite occasional misunderstandings, which were later corrected, at the regional level. Moreover, the fact that the Secretary has relied on various justifications to support this policy does not diminish the deference he is to be accorded in this case. What is important is that the policy, rather than the underlying rationale, has remained consistent. The Secretary is entitled to rely upon alternative grounds in support of his interpretation.

exempted from income, it must be a rebate authorized under a federal law *and* the purpose of the federal law must be to provide energy assistance. The district court concluded that the Housing Act was designed to provide housing assistance and not energy assistance, and, therefore, a UR did not qualify under the section 2014(d)(11)(A) exclusion.

The Third Circuit looked to the legislative history of the exclusion, specifically a defeated Senate proposal similar to the 1988 amendment that would have exempted only those "payments or allowances specifically designated for federal energy assistance by federal law," H.Rep. No. 377, 97th Cong., 1st Sess. 217, *reprinted in* 1981 U.S.Code Cong. & Admin.News 1965, 2314, and the remarks of Representative Richmond, the primary House sponsor of the bill, who stated that "[a]ll federal payments for the purpose of providing energy assistance would continue to be excluded as income, whether or not specifically designated for energy assistance," 127 Cong. Rec. H9878 (Dec. 16, 1981). The court concluded that the Secretary has unreasonably construed 7 U.S.C. § 2014(d)(11)(A), and "in effect has resurrected the defeated Senate language." 879 F.2d at 1131. The court further bolstered its decision by citing to the 1988 amendment which rearranged the language of the exclusion so as to indicate that it is the purpose of the payment, not the purpose of the statute, which determines whether the payment is for "energy assistance." *Id.*

Although technically correct on the narrow issue it considered, the Third Circuit, with all due respect, missed the larger question of whether utility reimbursements fall within the definition of "energy assistance." This is obvious from the tautologous language the court uses in stating its conclusion: "[g]iven Congress' clearly expressed intention, we are satisfied that all payments for energy assistance should be exempted from income when determining eligibility for food stamps." *Id.* at 1132. The court never considered the meaning of

the terms "energy assistance," which, as discussed above, do not refer not to *general* allowances for energy expenses, but rather payments designed solely to *offset* dramatic increases in home energy costs. Therefore, its holding is inapplicable to the issues here.

Summary judgment is granted in favor of the defendants on this claim. While the Court recognizes that "[i]t is a long-standing canon of construction that a statute should be read, whenever possible, to avoid constitutional entanglements," *West*, 879 F.2d at 1132 (citing *Califano v. Yamasaki*, 442 U.S. 682, 693, 99 S.Ct. 2545, 2553, 61 L.Ed.2d 176 (1979)), a court should not distort the plain meaning of a statute as revealed by its language, purpose, and history simply to avoid reaching the constitutional questions. Since the Court finds that utility reimbursements are not excludable under 7 U.S.C. § 2014(d)(11)(A), the discussion will now turn to the plaintiffs' equal protection and due process claims.

### B. Equal Protection

■ The plaintiffs claim that counting utility reimbursements as income creates an arbitrary and irrational distinction between public housing tenants who receive URs and and those who do not, thus violating the equal protection provisions embodied in the fifth and fourteenth amendments.[27] They argue that the Secretary's policy creates unconstitutional inequalities (1) between households whose UA does not exceed the total rent obligation, in which case no part of the UA is counted as food stamp income, and households whose UA does exceed the total rent obligation, in which case the UR is counted as food stamp income, and (2) between households that do not receive URs because the PHA directly provides the energy, leaving the household with no obligation to the utility company, in which case no part of the UA is counted as income, and households that receive URs, in which case the UR is counted as food stamp income.

---

27. The equal protection analysis applicable to the federal defendant under the fifth amendment's due process clause is the same as that applicable to the state defendant under the fourteenth amendment. *Buckley v. Valeo*, 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976).

The equal protection requirement "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982)). In the area of social and economic welfare, a classification does not violate equal protection if it has a "reasonable basis." *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1969). *Accord Lyng v. International Union UAW*, 485 U.S. 360, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988) (applying the reasonable basis test to classifications made under the Food Stamp Act).

The first disparity asserted by the plaintiffs can be illustrated by a comparison between two hypothetical tenants, Smith and Jones.[28] Both tenants live in identical HUD-subsidized apartments which use the same energy sources to fuel their heat and electricity. The only difference in their circumstances is household income.

| | SMITH | JONES |
|---|---|---|
| Adjusted monthly income | $300 | $100 |
| 30% of adjusted monthly income | 90 | 30 |
| Allowance for utilities | 75 | 75 |
| Rent paid by tenant | 15 | 0 |
| Utility reimbursement | 0 | 45 |

The Brooke Amendment limits both Smith and Jones to paying thirty percent of their adjusted monthly income as their Total Tenant Payment. Each receives a monthly utility allowance of $75, a figure which reflects the average utility bills that households living in apartments like those occupied by Smith and Jones might expect to incur. Smith pays $15 per month in tenant rent after subtracting his utility allowance from his Total Tenant Payment. He receives no utility reimbursement. In contrast, Jones' Total Tenant Payment is less than the utility allowance. Therefore, he receives a utility reimbursement of $45 per

month. In Smith's case, none of the $75 utility allowance is counted as income in the food stamp program, while in Jones' case, $45 of the $75 per month is included as income for food stamp purposes.[29] This additional $45 in food stamp income would reduce Jones' food stamp allotment by about $15 per month.[30] The plaintiffs' claim that this creates an arbitrary and irrational distinction between Smith and Jones.

The fundamental flaw in this argument is that Smith and Jones are not "similarly situated" for purposes of equal protection analysis. The one variable is household income. Smith and Jones are treated differently because they *are* different—Smith's adjusted monthly income is three times that of Jones. If Smith's income was equal to Jones' income, both would be treated identically, all other things being equal, for food stamp purposes. Moreover, while Jones' food stamp allotment is reduced by including the UR as income, that allotment is still substantially higher than that of Smith because of the disparity in their incomes. Jones also receives more real income than Smith as a result of the utility allowance, assuming both tenants consume approximately the same amount of energy. Smith's out of pocket expenses include $15 for rent plus his utility costs. In contrast, Jones pays nothing for rent and receives $45 to pay his utility bills.

The plaintiffs' second equal protection argument contrasts the difference in income and expenses experienced by residents of PHA-owned public housing under a group metering system and under an individual metering system. Prior to 1981, utilities in these buildings were not individually metered and the PHA paid all energy costs as a part of the tenant's rent. *West*, 879 F.2d at 1129. In 1981 HUD began requiring local PHAs to install individual

---

**28.** This hypothetical is set forth in Exhibit F to the Plaintiff's Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment. Jones represents the class members.

**29.** In neither case is the amount of the UA that is applied toward the TTP counted as income in calculating food stamp benefits.

**30.** Food stamp allotments are reduced by at least thirty cents for each dollar of countable net income. 7 U.S.C. § 2017(a). Therefore, for each three dollars of a UR counted as income, the recipient receives at least one dollar less per month in food stamps.

utility meters for each unit of public housing so that each household could be metered separately for utilities. *Id.* The purpose of this change was to encourage users to conserve energy. 24 U.S.C. § 965.401. Because reasonable utility costs are the PHA's responsibility under the Brooke Amendment, a PHA which requires tenants to pay individually for utilities must provide them with a utility allowance that reflects the average utility bills that households in buildings of that particular type might expect to incur. 24 C.F.R. § 965.470-480.

The following hypothetical assumes a monthly adjusted gross income of $100, a monthly utility allowance of $50, and actual monthly utility costs of $50.[31]

|  | Group Metering | Individual Metering |
|---|---|---|
| Adjusted monthly income | $100 | $100 |
| 30% of adjusted monthly income | 30 | 30 |
| Allowance for utilities | 0 | 50 |
| Rent paid by tenant | 30 | 0 |
| Utilities paid by tenant | 0 | 50 |
| Utility reimbursement | 0 | 20 |
| Total out of pocket expenses for rent + utilities | 30 | 30 |

PHA tenants who are not individually metered for utilities receive no utility bills. Their utility costs are included in their rent. Any amount the PHA pays to utility companies on behalf of these tenants is not considered income for food stamp purposes. Thus, group metered tenants enjoy the benefit of their utilities without an increase in their income. The UAs given to individually metered class members are counted as income to the extent they exceed their Brooke Amendment rent obligation (30% of AGI) and are remitted as URs, even though class members are required to pay their own utilities. The plaintiffs claim that this amounts to an arbitrary and irrational distinction between group metered tenants and individually metered tenants.

A similar argument was rejected in *Ruhe v. Bergland,* 683 F.2d 102 (4th Cir.1982) (per curiam). In *Ruhe* Section 8 housing subsidies were made to landlord or mortgagees rather than directly to the beneficiaries. *Id.* at 103. These subsidies were excluded from income in calculating food stamp benefits. Other local housing subsidies were made directly to the beneficiaries and were counted as income for food stamp purposes. The court held that distinguishing between vendor payments, *i.e.* payments made directly to a third party for a household expense, and payments made directly to the household violated neither the due process clause nor the equal protection clause. The court concluded that "a reasonable differentiation between third party and direct payment arises from the recipient's control of cash in one situation and the lack of control in the other." *Id.* at 106.

The defendants argue that the disparity in the present case arises from different treatment accorded vendor payments and money paid directly to a household, *see* 7 C.F.R. § 273.9(c)(1), a distinction that meets the "reasonable basis" test. In response, the plaintiffs assert that, unlike the plaintiffs in *Ruhe,* they are compelled to spend their URs on utility charges. They claim they cannot divert the URs to other purposes or their utility service will be terminated and the plaintiffs will be evicted.

While in many circumstances this may be true, plaintiffs cite no law or regulation which requires them to use their URs for utility bills.[32] A PHA *may* evict a tenant if his utilities have been turned off for such a period of time as to create a health hazard, but a PHA is not *required* to evict a tenant who does not use his UR to pay utility bills or simply because his utilities are turned off.[33] Thus, while it may be prudent for

---

**31.** This hypothetical is adapted from *West,* 879 F.2d at 1129-30.

**32.** For example, while HUD regulations require the PHA leases to impose certain obligations on the tenant, these obligations do not include any requirement to use the UR solely to pay his utility bills. *See* 24 C.F.R. § 966.4(f).

**33.** HUD regulations provide that a "PHA shall not terminate or refuse to renew the lease other than for serious or repeated violations of material terms of the lease such as failure to make payments due under the lease or to fulfill the tenant obligations set forth in the lease or for other good cause." 24 C.F.R. § 966.4(1).

the tenant to use the UR to pay his utility bills, there is no law or regulation requiring him to do so. As in *Ruhe*, the tenant has control of how the payment is used.

Furthermore, the purpose behind individual metering with utility reimbursements was "to encourage residents to conserve energy so that if a resident spends less than the [utility] reimbursement, the difference may be pocketed." *West*, 879 F.2d at 1129 n. 8. *See also* 24 C.F.R. § 965.401. HUD regulations explicitly recognize that the utility allowance which is used to calculate a tenant's utility reimbursement may be more than the tenant's actual utility bills. 24 C.F.R. § 965.474. It is therefore possible for a tenant who conserves energy to receive a gain in real income from the utility reimbursement.

The change sought by the plaintiffs is in itself imperfect because it would create new inequalities. For example, if URs were excluded from food stamp income, the plaintiffs would receive the same amount of food stamps as a family of the same size with identical AFDC and support benefits and the same total shelter costs (including utilities) but which, unlike the plaintiffs, did not receive the $44 utility reimbursement because the family lived in an apartment which was not subsidized by Section 8.

For the above reasons, this Court cannot conclude that the defendants have acted "in a patently arbitrary or irrational way." *United States Railroad Retirement Bd. v. Fritz*, 449 U.S. 166, 177, 101 S.Ct. 453, 460, 66 L.Ed.2d 368 (1980). To be sure, the UR household is in a worse position than the household with identical income who occupies public housing and does not receive a UA, since counting the UR as additional income reduces its food stamp allotments. The Court agrees with the plaintiffs that this does not seem fair. However, any unfairness is mitigated somewhat by two factors. First, using Ms. Larry as an example, an increase in income of $44 per month—the amount of her UR—will not decrease her food stamp allotment by $44. If her UR were not counted as income, Ms. Larry would receive approximately $15–20

a month more in food stamp benefits, an average of about $4–5 more per week. Second, the excess shelter deduction, 7 U.S.C. § 2014(e), permits a deduction for housing costs that exceed 50% of the monthly household income after all other applicable deductions have been allowed. This deduction benefits the lowest income households the most.

The fact that some households may not be as favorably situated as others in the public housing or Section 8 programs does not in itself make out a constitutional violation. As the Supreme Court has repeatedly emphasized:

> In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some "reasonable basis," it does not offend the Constitution simply because the classification "is not made with mathematical nicety or because it results in some inequality."

*Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1969) (quoting *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369). In rejecting the plaintiffs' constitutional challenge, this Court does not conclude that "the [challenged program] is wise, that it best fulfills the relevant social and economic objectives ... or that a more just and humane system could not be derived." *Dandridge*, 397 U.S. at 487, 90 S.Ct. at 1162. However, "the Constitution does not empower this court to second guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients." *Id.* For better or for worse, "the intractable economic, social and even philosophical problems presented by public welfare assistance are not the business of this court." *Id.* Summary judgment is granted in favor of the defendants on this claim.

## C. *The Administrative Procedure Act*

Plaintiffs argue that the Secretary has violated the Administrative Procedure Act ("APA") by failing to follow the rule-mak-

ing procedures set out in 5 U.S.C. § 553, specifically that the Secretary has not published a regulation which states that the HUD utility reimbursements are considered income in calculating food stamp allotments. A similar argument was raised by the plaintiff in *Mitchell* and rejected by the district court. The court found that since 1978 the regulations have included all assistance payments, unless otherwise excluded, as income in determining food stamp benefits. *Mitchell*, slip op. at 29–30 n. 23; *see* 7 C.F.R. § 273.9(b) and (c)(1)(ii). The court noted that the Secretary's regulation, like the statute, defines income by a rule of exclusion, and nothing in the APA "requires the Secretary to engage in the virtually impossible task of listing every type of benefit which is *not* excluded from income." *Id.* at 29 n. 23 (citing *United States v. Rutherford*, 442 U.S. 544, 553–54, 99 S.Ct. 2470, 2475–76, 61 L.Ed.2d 68 (1979)).

Moreover, the APA explicitly excludes interpretations of existing rules and statutes from the notice and comment requirements. 5 U.S.C. § 553(b)(3)(A). Interpretive rules explain "the meaning given by the agency to a particular word or phrase in a statute or rule it administers." *Batterton v. Marshall*, 648 F.2d 694, 705 (D.C. Cir.1980). *Accord McKenzie v. Bowen*, 787 F.2d 1216 (8th Cir.1986). In *General Motors Corporation v. Ruckelshaus*, 742 F.2d 1561 (D.C.Cir.1984), the court observed that an interpretive rule "simply states what the administrative agency thinks the statute means, and only 'reminds' affected parties of existing duties.... [If] the agency intends to create new law, rights, or duties, the rule is properly considered to be a legislative rule 'and thus requires notice and publication.'" *Id.* at 1565 (citations omitted). *Accord Matzke v. Block*, 564 F.Supp. 1157, 1165 n. 3 (D.Kan.1983) ("[a]n agency's interpretation of an enabling statute which results in a substantial rule of general applicability is a rule-making under the APA.... [and] subject to general notice publication in the federal register and an opportunity for public comment").

For the reasons stated in the analysis of the legislative history of 7 U.S.C. § 2014(d)(11), the Court finds that the Secretary's interpretation does not create new law, rights, or duties, and the APA therefore does not require the Secretary to publish his interpretation of what payment or allowances are "made for the purpose of providing energy assistance (A) under any Federal law." 7 U.S.C. § 2014(d)(11)(A). Summary judgment is granted to the defendants on this claim.

## IV. CONCLUSION

While sympathetic to the plight of the plaintiffs, the Court is mindful of the Supreme Court's admonition in *Vance v. Bradley:*

> The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted. Thus, we will not overturn such a statute unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational.

440 U.S. 93, 97, 99 S.Ct. 939, 942–43, 59 L.Ed.2d 171 (1979) (footnote omitted). In our system of checks and balances, federal courts "do not sit as councils of revision, empowered to rewrite legislation in accord with their own conceptions of prudent public policy." *United States v. Rutherford*, 442 U.S. 544, 555, 99 S.Ct. 2470, 2477, 61 L.Ed.2d 68 (1979). The Secretary's policy might not be what this Court would choose if the decision were properly a judicial one. But that does not make the present policy of counting utility reimbursements as income contrary to congressional intent or the Constitution.

Therefore, the defendant's motion for summary judgment is granted as to all claims.

IT IS SO ORDERED.