**Robin BAUM, et al., Plaintiffs,**

v.

**Mike ESPY, et al., Defendants.**

**No. 5:88 CV 0234.**

United States District Court,
N.D. Ohio, E.D.

Dec. 13, 1993.

---

Robert Harold Bonthius, Jr., Peter M. Iskin, Legal Aid Soc. Of Cleveland, Cleveland, OH, for plaintiffs.

Kathleen Ann Sutula, Michael Anne Johnson, Alexander A. Rokakis, Office of the U.S. Atty., Cleveland, OH, for Clayton Yeutter, Secretary of the Dept. of Agriculture.

Alan P. Schwepe, Office of the Atty. Gen., Columbus, OH, for Kathryn T. Glynn, Director of Ohio Dept. of Human Services.

Kent M. Graham, Roxana R. Lyle, Office of the Pros. Atty., Ravenna, OH, for John J. Witkosky, Adm'r of Portage County Dept. of Human Services.

## MEMORANDUM OPINION

DOWD, District Judge.

### I. INTRODUCTION

On November 16, 1992,[1] the U.S. Court of Appeals for the Sixth Circuit reversed and remanded this Court's prior decision wherein summary judgment had been granted to the plaintiffs on the ground that 7 U.S.C. § 2014(d)(1) required exclusion of utility reimbursements ("UR") from income for purposes of determining food stamp eligibility.[2] *See Baum v. Madigan*, 979 F.2d 438 (6th Cir.1992). The Sixth Circuit instructed this Court to enter judgment for the defendants on that issue, *Baum v. Madigan*, 979 F.2d at 443, and noted that issues raised in plaintiffs' cross-appeal need not be addressed until this Court made a decision on the remaining claims of the plaintiffs which had not yet been addressed.[3]

The original cross-motions for summary judgment, which are once again before this Court on remand, were filed by the Secretary of the United States Department of Agriculture ("the Secretary") and the Director of the Ohio Department of Human Services[4] [collectively "defendants"] (Docket No. 51) and by the plaintiffs (Docket No. 94).[5]

For the reasons discussed below, summary judgment is granted for the defendants and against the plaintiffs and this case is dismissed.

### II. FACTUAL BACKGROUND

The facts in this case are not in dispute. However, the following background, set forth

---

1. A true copy of the Sixth Circuit's Order was received on December 10, 1992. (*See* Docket No. 164).

2. This Court's decision was reported at *Baum v. Yeutter*, 750 F.Supp. 845 (N.D.Ohio 1990).

3. This Court noted in its ruling that "[d]ue to the above disposition, the Court need not consider the plaintiffs' remaining claims based upon 7 U.S.C. § 2014(d)(5) and (6), the *Cort v. Ash* constitutional tort theory and claim under 42 U.S.C. § 1983 based upon the alleged violation of the Brooke Amendment to the Federal Housing Act of 1937, and the plaintiffs' claim that the government has violated the Administrative Procedure Act, 5 U.S.C. § 701–706 by crediting plaintiffs with income for their utility reimbursement monies." *Baum v. Yeutter*, 750 F.Supp. at 854 n. 6.

4. There is a third defendant: the Administrator of the Portage County Department of Human Services, who has responsibility for administering the food stamp program in that county. This defendant joined in the other defendants' motion for summary judgment (*See* Docket No. 174).

5. These motions have since been supplemented several times (Docket No. 51, supplemented by Docket Nos. 89, 113, 172, 175; Docket No. 94, supplemented by 118, 173, 182). The motions and their supplements have been opposed (Docket Nos. 114, 176, 177, and 178) and replies to the oppositions have been filed (Docket Nos. 115, 179 and 180). All of these documents have been considered by the Court.

in this Court's earlier decision, is helpful to an understanding of the nature of the claims and defenses.

Plaintiffs, as public housing tenants, pay "rent" in the amount of 30% of the tenant's adjusted monthly gross income. Plaintiffs' public housing rent, whatever that figure is determined to be, automatically includes a predetermined amount for reasonable utilities consumption, known as a utilities allowance. Plaintiffs pay no more than 30% of their adjusted monthly gross income for rent, which includes the predetermined amount for utilities.

Unlike other public housing tenants, plaintiffs pay some or all of their costs for utilities directly to the utility suppliers. For reasons described *infra*, the amount plaintiffs pay directly for utilities exceeds the total monthly amount plaintiffs' [sic] owe to the local Public Housing Authority ("PHA"), in essence plaintiffs' landlord. The PHA reimburses plaintiffs the difference between plaintiffs' rent obligation and the utilities allowance in the form of a check made payable to plaintiffs.

When public housing tenants receive an allowance for utilities expenses and the utilities are paid by the PHA, the Secretary of Agriculture excludes the benefit tenants receive from household income for purposes of determining food stamp awards. However, the Secretary counts the "utility reimbursement payments" plaintiffs receive as household income. The calculation of food stamp benefits are [sic] based on plaintiffs' relative levels of household income: the lower the income level, the more food stamps the household is entitled to receive and vice versa. Because these utility reimbursement payments are included in plaintiffs' income for purposes of determining food stamp awards, plaintiffs receive a smaller award of food stamps than they would receive if the income was excluded.

*Baum v. Yeutter*, 750 F.Supp. at 845–46.

## III. THE UNDERLYING STATUTORY SCHEMES

The relevant statutory schemes are also set forth in the Court's prior decision as follows.

### A. The Federal Housing Subsidy

Plaintiffs live in federally assisted rental housing in Portage County and Pike County, Ohio. According to what is commonly known as the Brooke Amendment, lower income families living in federally assisted public housing are charged rent based upon a formula that takes into consideration a household's income. 42 U.S.C. § 1437a(a). As a practical matter, plaintiffs are required to pay monthly rent in the amount of 30 percent of a household's monthly adjusted income. The amount of HUD's contribution is equal to the difference between the contract rental and the amount the household is required to pay. 42 U.S.C. § 1437f(c)(3). Included as "rent" are the reasonable amounts paid for utility services ("utilities") which are defined to include the costs for electricity, gas, heating fuel, water and sewage service, and trash collection. 42 U.S.C. § 1437f(c)(1); 24 C.F.R. § 965.472 (1989). The local PHA determines a community-wide utility allowance ("UA"), and adds that figure to each public housing tenant's rent, irrespective of the actual amount spent on utilities consumption, although a household that spends more than the UA is usually required to pay for the cost of the excess usage. 24 C.F.R. § 965.470–482 (1989). The UA is established at a level equal to "the monthly cost of a reasonable consumption of such utilities and other services for the unit by an energy-conservative household of modest circumstances." 24 C.F.R. § 913.102 (1989).

Prior to 1981, the utilities in multi-resident apartment buildings were metered on an aggregate basis, and individual households did not pay for their own utilities separate from the monthly rent which included an allowance for utilities. In 1981, HUD began requiring local PHA's to install individual utility meters so that each household would pay all or a part of the monthly utility expense. As it now stands, three different methods for collection and payment of utilities in public housing exist. First, in older public housing units, the

PHA may purchase the utilities directly and add the monthly costs of the utilities to the tenant's rent obligation, without use of a UA. The household pays only its Brooke Amendment rent obligation subject to additional flat fee charges for certain appliances. 24 C.F.R. § 965.471(b); 965.-477(b) (1989).

Second, the PHA again purchases the utilities directly. A UA is determined for the housing project and that figure is added to a tenant's monthly rent owed without regard to whether or not a tenant may in fact have used less of the allocated utilities amount. A tenant's utility usage is monitored by a "checkmeter," which assesses a tenant a surcharge if the tenant exceeds the allocated amount for utilities. The surcharge is a payment owed in addition to the Brooke Amendment rent charge. 24 C.F.R. § 965.470–472 (1989).

The third utility payment method gives rise to the claims before the Court. An individual meter for utility consumption is installed at the dwelling unit and the resident purchases the utility services *directly* from the utility supplier. Again, the tenant is granted a certain utility allowance ("UA"). Rather than examining a tenant's actual utility expenses in a given month, the PHA assumes that a tenant has spent the entire UA for the month. Because of this assumption, for many low income public housing families the figure represented by the UA is used as a credit against rent owed to the PHA and the tenants merely pay the residual. However, plaintiffs' income is so low that the UA covers plaintiffs' rent and results in an additional amount owed by the PHA to the tenant, defined as the "utility reimbursement." 24 C.F.R. § 813.102 (1989). The PHA reimburses the plaintiffs the difference between the monthly rent owed and the UA. . . .

### B. The Food Stamp Program

The Secretary of Agriculture currently includes utility reimbursements as "income" for computation of food stamp eligibility. The calculation of food stamp benefits are [sic] based on plaintiffs' relative levels of household income: the lower the income level, the more food stamps the household is entitled to receive and vice versa. 7 U.S.C. § 2017(a). In a phrase reminiscent of the Internal Revenue Code, household income is defined to include "all income from whatever source." Income eligibility limits for food stamp benefits is [sic] based upon a household's net income. In order to determine a household's net income, certain amounts of income are simply not counted or "excluded" pursuant to 7 U.S.C. § 2014(d). Further reductions in the amount of net income are accomplished by various deductions, including when applicable, the household's "excess shelter deduction." 7 U.S.C. § 2014(e). If income is not properly excluded from a determination of household income, then a recipient is denied the benefit of food stamps the recipient would have received given the correlation between lower net income leading to an increased award of food stamps. *Baum v. Yeutter*, 750 F.Supp. at 846–48.

### IV. DISCUSSION

As stated above at note 3, the Court must address the remaining issues raised in the second amended complaint ("Complaint") and summary judgment motions which were not previously decided: 1) the two equal protection claims; 2) the alleged violation of the Food Stamp Act, 7 U.S.C. § 2014(d)(5) and (6);[6] 3) the alleged violation of the U.S. Housing Act of 1937, also referred to as a violation of the Brooke Amendment; and 4) the alleged violation of the Administrative Procedure Act, 5 U.S.C. § 706. Each issue will be addressed in turn.

### A. The Equal Protection Claims

■ Plaintiffs' Complaint sets forth two equal protection claims (Claims I and II). In the first, plaintiffs allege that "defendants have created two groups of residents of federally assisted rental housing who purchase their utility directly from the utility supplier." (Complaint, ¶ 35). Both groups are comprised of tenants who have individually metered utilities. The first group (including

---

**6.** The Court already decided, and was reversed, as regards 7 U.S.C. § 2014(d)(1).

plaintiffs) consists of those tenants who, because the UA exceeds 30% of their adjusted monthly income, receive URs (Complaint, ¶ 36); the second group consists of tenants who, because they have slightly higher adjusted monthly incomes than the first group, do not receive URs (Complaint, ¶ 37). Eligibility for food stamps for members of the first group is affected by the Secretary's inclusion of the UR in income.

In Claim II of the Complaint, plaintiffs allege that "defendants have created two groups of residents of federally assisted rental housing whose dwellings have checkmeters or individual meters for utility consumption." (Complaint, ¶ 45). The first group (including plaintiffs) is the same as the first group in the first equal protection claim described above (Complaint, ¶ 46). The second group consists of tenants who have checkmeters, and therefore do not pay their own utilities or receive URs, and tenants who have individual meters but receive no URs. (Complaint, ¶ 47). As in the first equal protection claim, plaintiffs allege that the food stamp eligibility of members of the first group is affected by the Secretary's inclusion of URs in income. Plaintiffs allege that the distinction between the two groups in each of the two equal protection claims is unreasonable. (Complaint, ¶¶ 42 and 52).

The issue of the constitutionality (on equal protection grounds) of including URs in income for food stamp purposes was considered in *Larry v. Yamauchi*, 753 F.Supp. 784 (E.D.Ark.1990), a case which was cited approvingly for another proposition by the Sixth Circuit in *Baum v. Madigan*, 979 F.2d at 443. The claims of the plaintiffs in *Larry* are directly on point with the claims of plaintiffs in the instant suit:

They argue that the Secretary's policy creates unconstitutional inequalities (1) between households whose UA does not exceed the total rent obligation, in which case no part of the UA is counted as food stamp income, and households whose UA does exceed the total rent obligation, in which case the UR is counted as food stamp income, and (2) between households that do not receive URs because the PHA directly provides the energy, leaving the household with no obligation to the utility company, in which case no part of the UA is counted as income, and households that receive URs, in which case the UR is counted as food stamp income.

*Larry v. Yamauchi*, 753 F.Supp. at 799.

This Court finds compelling the reasoning of *Larry* as regards the equal protection claims. The *Larry* court advanced a hypothetical comparing two tenants, Smith and Jones, who both "live in identical HUD-subsidized apartments which use the same energy sources to fuel their heat and electricity." *Id.* at 800. The only difference was in their household incomes. This resulted in the following scenario:

|  | SMITH | JONES |
|---|---|---|
| Adjusted Monthly Income | $300 | $100 |
| 30% of Adjusted Monthly Income | 90 | 30 |
| Utility Allowance | 75 | 75 |
| Brooke Amendment Rent | 15 | 0 |
| Utility Reimbursement | 0 | 45 |

Under the allegations of the instant complaint, Jones would be a member of the first group identified in the first equal protection claim and Smith would be in the second group. In Jones' case, $45 of the $75 UA would be included in income when computing food stamp eligibility; in Smith's case, no portion of the $75 UA would be considered income. In both *Larry* and the instant case, plaintiffs assert that this constitutes unequal treatment.

The *Larry* court disagreed, and this Court concurs, finding that

[t]he fundamental flaw in this argument is that Smith and Jones are not "similarly situated" for purposes of equal protection analysis. The one variable is household income. Smith and Jones are treated differently because they *are* different—Smith's adjusted monthly income is three times that of Jones. If Smith's income was equal to Jones' income, both would be treated identically, all other things being equal, for food stamp purposes. Moreover, while Jones' food stamp allotment is reduced by including the UR as income, that allotment is still substantially higher

than that of Smith because of the disparity in their incomes. Jones also receives more real income than Smith as a result of the utility allowance, assuming both tenants consume approximately the same amount of energy. Smith's out of pocket expenses include $15 for rent plus his utility costs. In contrast, Jones pays nothing for rent and receives $45 to pay his utility bills. *Id.* at 800.

In a similar manner, the *Larry* court considered a second hypothetical comparing tenants in group metering (i.e., similar to the instant case's checkmetering) and individual metering. The hypothetical assumed an "adjusted [monthly] income of $100, a monthly utility allowance of $50, and actual monthly utility costs of $50." *Id.* at 801.

| | Group Metering | Individual Metering |
| --- | --- | --- |
| Adjusted Monthly Income | $100 | $100 |
| 30% of Adjusted Monthly Income | 30 | 30 |
| Utility Allowance | 0 | 50 |
| Brooke Amendment Rent | 30 | 0 |
| Utilities Paid by Tenant | 0 | 50 |
| Utility Reimbursement | 0 | 20 |
| Total Out of Pocket Expenses for rent + utilities | 30 | 30 |

Under the allegations of the instant complaint, the individual metering tenants would be the first group identified in the second equal protection claim and the group metering tenants would be the second group. The group metering tenants pay no utilities and do not incur any increase in income for food stamp purposes. The individual metering tenants have their URs included as income, even though they pay their own utility bills. This, plaintiffs in *Larry* and the instant case allege, constitutes an unreasonable distinction.

The *Larry* court rejected the argument, citing a similar rejection in *Ruhe v. Bergland,* 683 F.2d 102 (4th Cir.1982) (also cited with approval for a different reason in *Baum v. Madigan,* 979 F.2d at 442).

The [*Ruhe* ] court held that distinguishing between vendor payments, i.e. payments made directly to a third party for a household expense, and payments made directly to the household violated neither the due process clause nor the equal protection clause. The court concluded that "a reasonable differentiation between third party and direct payment arises from the recipient's control of cash in one situation and the lack of control in the other." [*Ruhe v. Bergland,* 683 F.2d] at 106.

*Larry v. Yamauchi,* 753 F.Supp. at 801. This Court finds the reasoning of *Larry* and *Ruhe* to be correct.

Plaintiffs argue that they really have no control over the URs because they are required to use the money to pay their utilities or suffer eviction. The *Larry* court addressed this argument, too.

While in many circumstances this may be true, plaintiffs cite no law or regulation which requires them to use their URs for utility bills. [Footnote omitted]. A PHA *may* evict a tenant if his utilities have been turned off for such a period of time as to create a health hazard, but a PHA is not *required* to evict a tenant who does not use his UR to pay utility bills or simply because his utilities are turned off. [Footnote omitted]. Thus, while it may be prudent for the tenant to use the UR to pay his utility bills, there is no law or regulation requiring him to do so. As in *Ruhe,* the tenant has control of how the payment is used.

. . . It is therefore possible for a tenant who conserves energy to receive a gain in real income from the utility reimbursement.

*Id.* at 801–802. The *Larry* court concluded that the Secretary's policy was not "patently arbitrary or irrational." *Id.* at 802 (quoting *United States Railroad Retirement Bd. v. Fritz,* 449 U.S. 166, 177, 101 S.Ct. 453, 460–61, 66 L.Ed.2d 368 (1980)). "The fact that some households may not be as favorably situated as others in the public housing or Section 8 programs does not in itself make out a constitutional violation." *Id.; see also Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970) (quoting *Lindsley v. Natural Carbonic Gas Co.,*

220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911)) (a reasonably based classification "does not offend the Constitution simply because [it] 'is not made with mathematical nicety or because it results in some inequality' ").

In conclusion, the *Larry* court commented as follows:

> In rejecting the plaintiffs' constitutional challenge, this Court does not conclude that "the [challenged program] is wise, that it best fulfills the relevant social economic objectives ... or that a more just and humane system could not be derived." *Dandridge*, 397 U.S. at 487, 90 S.Ct. at 1162. However, "the Constitution does not empower this court to second guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients." *Id.* For better or for worse, "the intractable economic, social and even philosophical problems presented by public welfare assistance are not the business of this court." *Id.*

*Larry v. Yamauchi*, 753 F.Supp. at 802. This Court believes that the *Larry* court had it right.

Accordingly, finding no equal protection violation, summary judgment is granted for defendants and against plaintiffs on the first and second claims of the complaint.

**B. *Violation of the Food Stamp Act***

▓ Plaintiffs assert that including the utility reimbursement as income for purposes of determining food stamp eligibility is unlawful under 7 U.S.C. § 2014(d)(5) and/or § 2014(d)(6). This challenge requires the Court to carefully examine the language of

7. As the Sixth Circuit pointed out in *Baum v. Madigan, supra,*
   "Where the language is plain and admits of no more than one meaning, *the duty of interpretation does not arise,* and the rules which are to aid doubtful meanings need no discussion ...
   "Statutory words are uniformly presumed, unless the contrary appears, to be used in their ordinary and usual sense, and with the meaning commonly attributed to them."
   *Baum v. Madigan,* 979 F.2d at 441 (quoting *Caminetti v. United States,* 242 U.S. 470, 485–86, 37

the statute and the Secretary's interpretation of that language.[7]

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).[8]

*1. 7 U.S.C. § 2014(d)(5)*

▓ Except for certain exceptions not applicable here, 7 U.S.C. § 2014(d)(5) provides that household income should exclude "reimbursements which do not exceed expenses actually incurred and which do not represent a gain or benefit to the household...."

Plaintiffs argue that, to the extent the UR does not exceed their actual utility cost,[9] the UR is merely a reimbursement to the tenant for having paid utility costs which, under the Brooke Amendment, are the responsibility of the landlord.

S.Ct. 192, 194–95, 61 L.Ed. 442 (1917) (emphasis added)).

8. Congressional intent is discerned from the statutory language, contemporaneous legislative history, earlier construction of the statute and subsequent legislation. *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108–20, 64 L.Ed.2d 766 (1980).

9. Plaintiffs concede that any amount that exceeds actual utility costs can properly be considered income.

The Secretary argues that, because a deduction for ordinary living expenses is separately allowed under Section 2014(e),[10] Congress intended that the Section 2014(d)(5) exclusion be limited to reimbursements for out-of-pocket expenses incurred in connection with employment and activities such as volunteer work.

The applicable regulation of the Secretary interprets the statutory language as applying to:

Reimbursements for past or future expenses, to the extent they do not exceed actual expenses, and do not represent a gain or benefit to the household. Reimbursements for normal household living expenses such as rent or mortgage, personal clothing, or food eaten at home are a gain or benefit and, therefore, are not excluded. To be excluded, these payments must be provided specifically for an identified expense other than normal living expenses, and used for the purpose intended.

7 C.F.R. § 273.9(5).

Applying the two-step *Chevron* analysis, the Court must first look to Congressional intent and, only if that is unclear, to agency interpretation. The statutory language is clear that reimbursements which do not constitute a gain or benefit are to be excluded from income. However, whether the URs amount to "a gain or benefit," even if they never exceeded actual utility costs, is not clear. Thus, reference to legislative history is appropriate.

The Committee Report accompanying the Food Stamp Act of 1977 contains the following comment with respect to Section 2014(d)(5):

This subsection would also exclude from income reimbursements for out-of-pocket expenses, such as to volunteers serving as foster grandparents, senior health aides, senior companions, or in similar capacities, or to persons in training programs, so long as the reimbursements were no greater than the expenses actually incurred. This exclusion is a matter of simple fairness to

those, particularly the elderly, who donate their time and effort to the public good as well as to those who are simply given reimbursement for expenses incurred in the course of their jobs, either in the form of payment covering specific vouchers or else as an allowance for projected expenses.

H.R.Rep. No. 464, 95th Cong., 1st Sess. 36, *reprinted in* 1977 U.S.C.C.A.N. 1704, 1978, 2012. The Committee also noted, in its discussion of the excess shelter expense deduction found in Section 2014(e), that the

[i]tems allowable as shelter cost would encompass all of the items now included in the current shelter costs deduction such as rent, mortgage payments (including interest), utility bills (including heat, water, electricity, sewer, garbage and trash collection ... but only if paid separately from rent or mortgage) ...

*Id.* at 62, *reprinted in* 1977 U.S.C.C.A.N. at 2040.

The Court finds that the Secretary's construction of the statute is permissible in light of the above legislative history, which does not specifically address the applicability to URs of the Section 2014(d)(5) reimbursement exclusion. The Committee's discussion of the standard and excess shelter expense deductions under Section 2014(e) suggests that it was *that* deduction, not the reimbursement exclusion, which was intended to take into account amounts paid for basic shelter, such as rent and utilities, when they are paid separately. In addition, the examples of reimbursements cited in the Committee report suggest that Section 2014(d)(5) was designed to permit reimbursements to food stamp recipients for out-of-pocket expenses incurred in relation to volunteer work, employment or training, not URs.

Accordingly, plaintiffs' assertion that the defendants violate 7 U.S.C. § 2014(d)(5) by including URs in income is without merit and is rejected.

10. 7 U.S.C. § 2014(e) provides for a standard deduction for ordinary living expenses in the form of shelter expenses plus an excess shelter expense deduction where monthly shelter expense "exceeds an amount equal to 50 per centum of monthly household income after all other applicable deductions have been allowed."

*2. 7 U.S.C. § 2014(d)(6)*

Section 2014(d)(6) provides for the exclusion from income of "moneys received and used for the care and maintenance of a third-party beneficiary who is not a household member."

Plaintiffs argue that "[i]t is the landlord, who is not a household member, who is the third-party beneficiary of [the UR] payments." (Docket No. 94, at 43).

Under the plain language of the statute, to which the Court must look first, *Baum v. Madigan*, 979 F.2d at 441, plaintiffs' argument is clearly without merit. The URs are not used "for the care and maintenance" of the landlord. Plaintiffs' interpretation of Section 2014(d)(6) stretches the ordinary meaning of the language entirely too far.

Accordingly, plaintiffs' assertion that the defendants violate 7 U.S.C. § 2014(d)(6) by including URs in income is without merit and is rejected.

In light of the above discussion, together with the instructions of the Sixth Circuit regarding Section 2014(d)(1), summary judgment must be granted in favor of defendants and against plaintiffs on the third claim of plaintiffs' Complaint which alleges violations of the Food Stamp Act.

*C. Violation of the Brooke Amendment*

In the fourth claim of the Complaint, plaintiffs assert that the Secretary's inclusion of URs in income for food stamp purposes violates the United States Housing Act of 1937, 42 U.S.C. § 1437a(a), ("the Brooke Amendment," for purposes of this discussion) and its implementing regulations, 24 C.F.R. Parts 813 and 913. (Complaint, ¶ 57).

In order for this claim to survive, this Court must find an express or implied private right of action against these defendants under the Brooke Amendment; that is, plaintiffs must have the right to sue the Secretary of Agriculture because his interpretation of the Food Stamp Act allegedly violates the Brooke Amendment.

There is nothing in "the language of Section 1437a ... [which] evince[s] any Congressional intent to create a private right of

action." *Stone v. District of Columbia*, 572 F.Supp. 976, 980 (D.D.C.1983), *vacated and remanded on other grounds*, 799 F.2d 773 (D.C.Cir.1986).

Even if one could find a private right of action for tenants to sue the Secretary of HUD for enforcement of the Housing Act, that would not automatically extend to a finding that tenants could sue the head of a different agency in an attempt to force that agency to interpret statutes unrelated to the Housing Act in a manner consistent with HUD's wishes.

In their motion for summary judgment, plaintiffs argue that "HUD, the federal agency responsible for implementing the Brooke Amendment, clearly finds defendant [Espy's] position [regarding the treatment of URs as income] to be wholly at odds with the Congressional aim of the Brooke Amendment." (Docket No. 94, at 52). Plaintiffs quote from the introductory notes to HUD's regulations that implement the Brooke Amendment as follows:

> [T]he revision would also clarify that utility reimbursements are a part of the program's subsidy of total shelter costs, reducing the likelihood that other government agencies would count the utility reimbursements as income for purposes of determining eligibility and levels of assistance for other assistance programs, while not counting the value of the rest of the housing benefit (a practice which effectively discriminates against tenants who pay their own utilities directly).

(Docket No. 94, at 53, quoting 49 F.R. at 21,483 (1984)). Plaintiffs also quote from a handbook that provides guidance to PHA's in the administration of the Section 8 program:

> Welfare agencies are *not* to count such [utility reimbursement] payments as income and thereby decrease the family's amount of welfare assistance.

(*Id.*, quoting HUD Handbook 7420.7 at ¶ 4–19(a)).

While this discussion is interesting, it is inapposite. Plaintiffs have cited, and the Court has found, no authority for the proposition that HUD's views regarding the interaction of its housing programs with the food

stamp program supersede the policies of the Secretary of the USDA who has been given the authority to administer the food stamp program. In fact, the law is to the contrary. *See, e.g., Dept. of Treas. v. Fed. Labor Relations Auth.*, 837 F.2d 1163, 1167 (D.C.Cir. 1988) (an agency's interpretation of "a statute other than that which it has been entrusted to administer" is not entitled to deference).

Plaintiffs also refer to the legislative history of the Food Stamp Act of 1977 wherein Congress expressed the view that counting of federal housing assistance payments as income, for purposes of the food stamp program, "would undercut the whole purpose of various housing acts...." H.R.Rep. No. 464, 95th Cong., 1st Sess. 32–33, *reprinted in* 1977 U.S.C.C.A.N. 1971, 2009. As a result, Congress decided that "[n]o rent subsidies or supplements paid to or payable to third parties could be treated as income, including sums paid to households under firm instructions for their transmission to landlords." H.R.Rep. No. 464, at 32, *reprinted in* 1977 U.S.C.C.A.N. at 2008.

Once again, this citation is inapposite. As pointed out in the discussion under Section A above (Equal Protection), tenants who receive URs are under no "firm instructions" to transmit the money to anyone, least of all their landlords.

In light of the above, the Court finds no authority for plaintiffs' fourth claim wherein they attempt to compel the Secretary to interpret the Food Stamp Act of 1977 in a manner consistent with the Brooke Amendment to the Housing Act. For this reason, summary judgment must be entered for defendants and against plaintiffs on the fourth claim of the Complaint.

### D. Violation of the Administrative Procedure Act

Plaintiffs assert that the Secretary's policy of including URs as income for food stamp purposes violates the APA "in that it is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law." (Complaint, ¶ 59).

In their motion for summary judgment, plaintiffs raise no real arguments to support this claim. They merely argue that, under the APA, they have a right to, and herein do, seek judicial review of the Secretary's action. Plaintiffs do not assert that the Secretary violated the APA in any way when promulgating the regulations implementing and interpreting the Food Stamp Act.

Finding no independent basis for plaintiffs' assertion of a violation of the Administrative Procedure Act, the Court finds that defendants are entitled to summary judgment on the fifth claim of plaintiffs' Complaint.

### V. CONCLUSION

In light of the discussion above, summary judgment is entered in favor of the defendants on all claims of plaintiffs' second amended complaint, disposing of this case in its entirety.

IT IS SO ORDERED.